# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **JOSEPH P. FINNEGAN,** ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **CIVIL ACTION** |
| ) | **NO. 16-40071-TSH** |
| **CSX TRANSPORTATION, INC.,** ) | |
| **Defendant.** ) | |
| ) | |

## MEMORANDUM OF DECISION AND ORDER
**March 25, 2019**

**HILLMAN, D.J.**

### Background

This is an action brought by Plaintiff, Joseph P. Finnegan ("Plaintiff" or "Finnegan") against CSX Transportation, Inc. ("Defendant" or "CSX") alleging claims for disability discrimination and retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§12112 and 12203 ("ADA") and the Massachusetts anti-discrimination statute, Mass.Gen.L ch. 151B, §4 ("Chapter 151B").[1]

This Memorandum of Decision and Order addresses the parties' cross-motions for summary judgment. Plaintiff seeks summary judgment on the issue of whether CSX violated the ADA and Chapter 151B by failing to reasonably accommodate him by refusing to engage in a meaningful interactive process. CSX seeks summary judgment on all of Plaintiff's claims on the grounds that the record evidence establishes, as a matter of law, that it did not discriminate or retaliate against

---

[1] Plaintiff also alleged a state law breach of contract claim which he voluntarily dismissed.

Finnegan. For the reasons that follow, the Plaintiff Joseph Finnegan's Motion for Partial Summary Judgment (Docket No. 46), is *denied* and Defendant CSX Transportation, Inc.'s Motion For Summary Judgment (48) is *granted, in part* and *denied, in part*.

## Summary Judgment Standard

Federal Rule of Civil Procedure 56 provides that the court shall grant summary judgment if the moving party shows, based on the materials in the record, "that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A factual dispute precludes summary judgment if it is both "genuine" and "material." *See Anderson v. Liberty Lobby*, 477 U.S. 242, 247-48, 106 S.Ct. 2505 (1986). An issue is "genuine" when the evidence is such that a reasonable factfinder could resolve the point in favor of the non-moving party. *Morris v. Gov't Dev. Bank*, 27 F.3d 746, 748 (1st Cir. 1994). A fact is "material" when it might affect the outcome of the suit under the applicable law. *Id*.

The moving party is responsible for "identifying those portions [of the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548 (1968). It can meet this burden either by "offering evidence to disprove an element of the plaintiff's case or by demonstrating an 'absence of evidence to support the non-moving party's case.'" *Rakes v. U.S.*, 352 F. Supp. 2d 47, 52 (D. Mass. 2005) (citation to quoted case omitted). Once the moving party shows the absence of any disputed material fact, the burden shifts to the non-moving party to place at least one material fact into dispute. *See Mendes v. Medtronic, Inc.*, 18 F.3d 13, 15 (1st Cir.1994) (discussing *Celotex*, 477 U.S. at 325). When ruling on a motion for summary judgment, "the court must view the facts in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor." *Scanlon v. Dep't of Army*, 277 F.3d 598, 600 (1st Cir. 2002). However, the court should not "credit bald assertions, empty conclusions, rank conjecture, or vitriolic invective."

*Caban Hernandez v. Philip Morris USA, Inc.*, 486 F.3d 1, 8 (1st Cir. 2007). ). "Cross-motions for summary judgment require the district court to 'consider each motion separately, drawing all inferences in favor of each non-moving party in turn.'" *Green Mountain Realty Corp. v. Leonard*, 750 F.3d 30, 38 (1st Cir. 2014)(citation to quoted case omitted).

## Facts

### Finnegan's employment with CSX

CSX is a railroad transportation company operating in the eastern United States and Canada. CSX operates various yards, including a yard in West Springfield, Massachusetts. Trains pass through the West Springfield yard every day and at all hours. Within the confines of the yard, yard crews move railcars on the track to switch and build trains, and maintenance-of-way employees move machinery on the track. For safety reasons, every track in the yard is considered live. The mainline track in the yard is used for trains to travel through the yard without stopping, and it is always considered live.

Finnegan began working at CSX in April 2008 as a Freight Conductor in CSX's Albany Division. This was a union position with responsibilities including the inspection, switching, loading, unloading, coupling, and de-coupling of trains; train travel; operation of switches; minor repair of railcars; monitoring of train movements; and understanding of and abiding by safety requirements. Prior to working for CSX, Finnegan, had a background in law enforcement and as a small business owner. In November 2008, CSX promoted Finnegan to Yardmaster, which was also a union position, and which required him to oversee the operation of the West Springfield yard. A Yardmaster supervises the movement of trains in the yard, ensures that railcars are switched and delivered on schedule, and ensures that paperwork and shipping documentation are accurate and complete. The Yardmaster job description describes the position as "sedentary" and involving "sitting for long periods of time." The Yardmaster works primarily in the yard

office, at a desk with computer monitors, radios, and video feed that allows the Yardmaster to monitor the trains coming and going and communicate by radio with crews, and where the Yardmaster can look out a window to the yard to make observations. Yardmasters work on three, distinct, eight-hour shifts, without excessive work hours.

The Yardmaster job summary states that one of its duties is to "[e]nsure the safe, efficient operation of yard service," and that it is required as a condition of employment to "work safely to prevent on the job accidents and injuries." As part of the job, a Yardmaster is required to mount and dismount locomotives in order to monitor crews at work." "Physical Requirements" for being a Yardmaster include the following:

- "Demonstrate auditory and visual acuity/tracking/ inspection"

- "May require climbing stairs at some locations"

- "Stoop/bend/kneel/crouch/balance/climb on occasion."

Additionally, the Yardmaster position is classified as "Safety Sensitive." The "Safety Sensitive" designation refers to the access and information that the Yardmaster has regarding the safety-sensitive information about train shipments and does not refer to the physical aspects of the job. According to Michael Blake ("Blake"), a current CSX employee who previously worked as a Yardmaster at the West Springfield terminal, the Yardmaster takes direction from the Trainmaster and although primarily an office job, at times requires the ability to perform tasks outside of the office on or around the tracks, including walking along the tracks to check discrepancies in the order of cars on a train, assisting in switching lines, picking up debris found in the yard or along the track, receiving deliveries (such as boxes of paper or packs of water bottles) and attending the sites of derailments.

In 2011, CSX promoted Finnegan to Trainmaster, which was a managerial position (Yardmasters report to Trainmasters, and Trainmasters reported to CSX's

Assistant Division Manager). Finnegan worked as a Trainmaster trainee beginning in March 2011, and, by September 2011, CSX assigned Finnegan to the West Springfield terminal, along with its satellite yards in Palmer and Pittsfield, Massachusetts, and the Cedar Hill yard in North Haven, Connecticut. The Trainmaster job summary states that the position is "[r]esponsible for the development and implementation of an aggressive Safety Action Plan" and that the Trainmaster works closely with other personnel "to make decisions with the goal of safety, service reliability, and cost." The job duties of Trainmaster include supervising train and engine employees and Yardmasters, conducting rules training, operating efficiency testing, communicating with other managers, addressing needs of customers, and various administrative and reporting duties.

The Trainmaster job description states that the Trainmaster "[c]onducts . . . operational efficiency testing." The Trainmaster must "coordinate activities related to derailments and other service disruptions," and must "[i]nvestigate and determine cause to ensure future train accident prevention." The Trainmaster works outside in the yard and along the mainline tracks to perform operational testing and investigate derailments; visits customers; and works in the office and occasionally at home. CSX's Trainmaster job description does not require a Trainmaster to "mount and dismount locomotives," and does not specify any "Physical Requirements," which must be met, nor does it require that a Trainmaster be able to "Demonstrate auditory and visual acuity/tracking/inspection" or "Stoop/bend/kneel/ crouch/balance/climb." However, the Trainmaster job description does state that the Trainmaster "[d]irectly supervises Train and Engine (T&E) employees . . ." and "performs safety observations," and "[r]eview[s] performance of T&E employees and identify areas for improvement." To supervise train and engine employees, the Trainmaster boards trains to speak with the crew or to address safety or training issues and takes monthly train rides with the train and engine crew. On a train ride, the

Trainmaster supervises and speaks with the crew about matters important to the railroad, such as specific incidents or patterns of safety issues, and submits reports of the train rides to the Assistant Division Manager. In July and August 2013, Finnegan submitted train ride reports to Jerald Lewandowski ("Lewandowski"), CSX's former Assistant Division Manager for the Northeast region. In September 2013, Lewandowski sent Trainmasters several reminders about the monthly train ride requirement.

CSX has two sub-designations for the Trainmaster position, Terminal Trainmaster and Line of Road Trainmaster. In West Springfield, the Trainmaster position is a Terminal Trainmaster position, which means that the Trainmaster is responsible for the terminal and the terminals in sub-yards within that territory. At times, the Terminal Trainmaster and Line of Road Trainmaster share duties. The Trainmaster job description does not distinguish between a Terminal Trainmaster and a Line of Road Trainmaster.

When Finnegan worked as a Terminal Trainmaster at the West Springfield terminal, he reported directly to Lewandowski. Lewandowksi had been a Trainmaster for 4 years and supervised Trainmasters for 9 years. As of November 2013, Nathan Lutz ("Lutz") also worked at the West Springfield yard as a second Terminal Trainmaster, reporting directly to Finnegan, and Sean Fitzpatrick ("Fitzpatrick") served as the Line of Road Trainmaster assigned to the region that included the West Springfield terminal and several of its satellite yards. Fitzpatrick had been hired by CSX in or around 2002. He first worked for CSX as a Trackman, later as a Yardmaster at the West Springfield terminal, and was promoted to the position of Line of Road Trainmaster by 2007.

During the relevant periods, the West Springfield yard was typically staffed with one or two Trainmasters. A Trainmaster works, or is on-call, 24 hours a day, 7 days a week. The Trainmaster job description provides that "[w]ork hours may vary in length and schedule," "may

include a nonstandard workweek and various shift work," and "include on\call 7 days a week, 24 hours per day, with extended periods of time away from home." The West Springfield Trainmaster is responsible for the West Springfield yard, satellite yards, and mainline in the area. Fitzpatrick was primarily responsible for the line-of-road between Selkirk, New York and Boston, Massachusetts, and he occasionally assisted with operations in the West Springfield yard.

Derailments happen at least once a month, at all times of day, and in all types of weather. The Trainmaster is responsible for investigating the area – including the train and the track – to identify the cause of the derailment. To do so, the Trainmaster walks the track to examine the train and the track, occasionally getting down on his knees to examine the track, and bending and stooping. Investigating derailments and conducting operational tests require the Trainmaster to regularly walk on uneven ballast and unpaved areas, in areas that are sloped and not graded flat, and through snow and ice along the train tracks.

The Federal Railroad Administration ("FRA") requires that railroads, including CSX conduct operational testing to test their employees on proper and safe operations. FRA regulations require railway operators to designate positions within the organization to conduct operational testing: CSX has designated the Trainmaster as the manager responsible for testing transportation employees. CSX has strict requirements that Trainmasters perform all operational testing, including banner testing. A Trainmaster must perform all required operational tests, not just some. If a Trainmaster did not conduct required operational tests, CSX would be out of compliance and subject to penalties by the FRA. During the relevant period, a Trainmaster was responsible for conducting 100 operational tests per month

In a "banner" test, a Trainmaster sets up a banner or other signal on a live track as a simulated obstruction to evaluate whether the operator of the train identifies the signal and safely

slows or stops the train as required.  Conducting a banner test, speed test, signal calling test, observations, and reviewing emergency protocols all require the Trainmaster to work along mainline tracks or in the yard in areas that are unpaved and not graded flat.  These tests sometimes require a Trainmaster to be around live train traffic, sometimes within five feet of the track.  Banner tests were performed by Trainmasters in teams and independently.

According to his annual performance evaluations, Finnegan performed his job in a satisfactory fashion. Finnegan's 2011 evaluation states, "Joe has hit the ground with enthusiasm and drive."  He received an overall performance score of 3.2 out of 4. Finnegan's 2012 evaluation states, "Joe embraces the CSX core values."  He received an overall performance of score of 3.1 out of 4.  On Finnegan's 2013 evaluation, he received an overall performance score in the range of 3 out of 4.

<h3 style="text-align:center">Finnegan goes out on Medical Leave; CSX's Vocational Program</h3>

In or around the summer of 2013, Finnegan began to suffer hearing loss in his left ear and he began walking with an unusual gait, which prompted him to consult with his physician. Finnegan was ultimately diagnosed with a "vestibular schwannoma," which is a "benign tumor that arises on the vestibular nerve."  On November 5, 2013, Finnegan went out on medical leave.  That same day, he was admitted to Tufts Medical Center in Boston, Massachusetts for removal of the tumor, which was performed by his neurologist,  Dr. Heilman. In s note dated January 27, 2014, Dr. Heilman, explained that Finnegan was suffering impairment of his balance "when he bends down to pick things up or turns quickly" and that he "does not have hearing on the left side."  He also reported that Finnegan's fatigue had improved. Dr. Heilman stated that he believed Finnegan could return to work by February 5, 2014.  In anticipation of his return to work, Finnegan provided Dr. Heilman with the CSX "Attending Physician's Return to Work Report MD-3 form," which Dr. Heilman completed on

January 27, 2014. Dr. Heilman indicated that Finnegan's prognosis was "Excellent," and he cleared Finnegan to return to work as of February 5, 2014, "with no restrictions."

CSX maintains a Vocational Rehabilitation Program, which is part of its Medical Department and is overseen by its Chief Medical Officer ("CMO"). According to a pamphlet provided to employees that summarizes of its services, "The mission of the Vocational Rehabilitation Program at CSX Transportation is to return injured or ill employees, to full-time, gainful employment." To achieve that end, the pamphlet states as follows: "If possible, the Vocational Rehabilitation Program will attempt to return you to your previous job. If you do not return to your previous job, the Vocational Rehabilitation Program will attempt to place you in a new job within the company." On its employee online "gateway," CSX represents, "This program is a vital part of our commitment to employees." The services that CSX represents that it will provide to its employees include the following:

- "job accommodation"

- "return to work in alternate positions within the company"

- "short term training for alternate positions with CSX"

- "training programs or on-the-job training"

- "job related training"

Employees seeking workplace accommodations are instructed to submit an Employee Accommodation Request Form to the Medical Department, which will then "take appropriate steps to evaluate the employee's request … A member of the Medical Department (which may include a Vocational Rehabilitation Manager) will contact the employee as to the request for an accommodation as part of an interactive process with the employee to

determine whether a reasonable and appropriate accommodation can be made." One of the functions of the Medical Department and the Vocational Rehabilitation Program is to assist employees in returning to work after injury.

Dr. Thomas Neilson ("Dr. Nielson") served as CSX's CMO from 2003 through 2014; he had worked with employees in the coal and railroad industry for over 30 years. During his time at CSX, the Medical Department assisted thousands of employees in returning to work following an injury. Scott Marshall ("Marshall") was the CSX vocational rehabilitation manager during the relevant time period. He had almost forty years of experience in vocational rehabilitation, including 20 years at CSX. Marshall maintained a caseload of approximately 80 employees per month whom he would assist as part of the Vocational Rehabilitation Program. He was assigned to assist Finnegan while he was on leave. He maintained "Case Progress Notes" documenting his communication with Finnegan between January 2014 and March 2016.

Dr. Nielson reviewed the medical documentation and concluded that because of Finnegan's difficulty with balance, he should undergo vestibular therapy before attempting to return to work. Finnegan agreed with that determination. Per CSX's recommendation, on February 12, 2014, Finnegan began vestibular therapy at the Fairlawn Rehabilitation Hospital in Worcester, Massachusetts. Finnegan's supervisor, Lewandowski, was aware that Finnegan was out on leave, that he had suffered balance issues, and that he had originally been cleared to return to work in or around February 2014, but that CSX's Medical Department delayed his return pending his completion of physical therapy. At the time that Finnegan was out on medical leave, Lewandowski had not heard of the term "interactive process" in 2014 and was unaware of the possibility that CSX might have an obligation to engage an employee in dialogue following a request for an accommodation of a disability, but he knew that it was CSX's practice to do so. According to Lewandowski, CSX did engage in the interactive process with Finnegan.

On April 22, 2014, Marshall entered into his Case Progress Notes: "Talked with the employee and he is still having problems with his balance. His therapy is extended another 8 sessions until May 9th. After that he will be discharged to continue therapy at home. Marshall further noted that when asked if he felt he could safely return to work as a Trainmaster, Finnegan said that he would like to try, but did not know how he would do especially with working long hours. That same day, Marshall forwarded Finnegan's physical therapy notes to Dr. Neilson, for his review. Finnegan's physical therapy treatment concluded on May 7, 2014. Finnegan did not make significant progress. For example, according to his physical therapist's "Vestibular & Balance Assessment Addendum," Finnegan continued to perform within normal range on tests with his eyes open, but outside of normal range with his eyes closed. Additionally, Finnegan noted to be deaf in his left ear, had unsteady balance, when attempting to walk, "veers off a liner path towards environmental obstacles as he is unable to maintain midline."

Finnegan was cleared to return to work, without restrictions, as of May 12, 2014. On May 8, 2014, Marshall recorded in his Case Progress Notes that he had contacted Finnegan about his return to work and that Finnegan shared that he thought that he might have difficulty with his return to work if he had to "work extended hours or do field testing." On May 9, 2014, Marshall called Finnegan and told him that he and Dr. Neilson had discussed Finnegan's employment status and that they decided to put Finnegan back to work on Monday, May 12, 2014. According to Marshall's notes, Finnegan "feels that he can do it." During that conversation, Marshall and Finnegan agreed that Finnegan would return to work on a trial basis and that he would "field test" himself. "Field testing" is also sometimes referred to as "trial return to work." Finnegan also asked whether he could return to work on May 19, 2014, rather than on May 12th. Finnegan's impression was that Marshall agreed to that request. On May 9, 2014, Dr. Neilson, issued a return to work order, which stated that Finnegan was "medically qualified to perform

railway service without restrictions, effective 05/12/14." Dr. Neilson authorized Finnegan to return to work because he believed Finnegan could safely perform the essential functions of his job.

Prior to Finnegan's return to work, Marshall informed Lewandowski of the fact that he would return to work on a trial basis. On May 10, 2014, Lewandowski sent Finnegan a text message informing him that his scheduled return to work date was May 12, 2014. This was Lewandowski's first communication with Finnegan since he had gone out on medical leave. Finnegan responded to Lewandowski by indicating that he and Marshall had agreed to a return to work date of May 19, 2014. Lewandowski replied to Finnegan by informing him that if he did not show up to work on May 12, 2014, he would be considered "absent from work." Following this exchange, Finnegan emailed Marshall the following message:

> Scott on Friday 5/9 at approximately 2 PM I received a call from you. The conversation established a return to work date of 5/19. I am confused with what is going on. You told me during this conversation that "I hate to spring this on you". Which you did and was a total change on your end. We left our conversation like our previous one that you requested my PT Summary Discharge notes before establishing a return to work date. These are not complete or available to date. There has been no change or further information provided. We agreed upon a trial period to begin on 5/19. The phrase we both agreed upon was a "Field Test". When I asked you to notify my Superiors that it was going to be a trial period you told me that was my responsibility. You also told me if I was unable to perform my job and it was unsafe for me it was my responsibility to take myself [out of service] and return to LTD and use the Vocational Rehab program. Please confirm.

On May 11, 2014, Lewandowski emailed Finnegan and Marshall, again directing Finnegan to return to work on May 12, 2014, because it was Lewandowski's understanding that Finnegan was cleared to return to work on that date.

<u>Finnegan Returns to Work</u>

On May 12, 2014, Finnegan returned to work and resumed his duties as a Terminal Trainmaster. While Finnegan was out on medical leave, Lutz had covered his job duties with

some assistance from Fitzpatrick. Following Finnegan's return to work, Lutz, resigned from his position. That position remained vacant, leaving Finnegan as the only Terminal Trainmaster assigned to the yard. Finnegan spoke with Lewandowski around that time regarding Lutz's resignation. During that conversation, Lewandowski did not inquire as to Finnegan's trial return to work. According to Fitzpatrick, Finnegan "was doing everything like he did before he went out as far as I know. If he wasn't, I think I would have known about it." According to Finnegan's wife, he had suffered balance issues before he had gone out on medical leave, prior to the removal of his tumor, *i.e.*, he had been performing his duties as Terminal Trainmaster for a period of months despite his balance issues.

Finnegan and Marshall discussed in the context of field testing himself, that if any time Finnegan didn't feel it was safe, he would "take [him]self out of service." Finnegan's attorney confirmed in a May 19, 2014 letter that Finnegan and CSX "agreed that if he comes across tasks that he could not perform, he would remove himself from service." During his trial return to work, Finnegan did not perform any of the four required banner tests, and he did not tell his manager that he was not performing the tests. Finnegan's purported reason for not doing the tests was that Fitzpatrick, the other Trainmaster, was working nights, *i.e.,* wasn't available to do the tests with him.

When he returned to work, Finnegan began to "field test" himself. Finnegan described his transition back to work, "like a kid riding a bike and taking the training wheels off." According to Finnegan, he was able to perform numerous job duties without any accommodation. For example, *according to Finnegan*, a good portion of his job involved duties that he performed from his office, his home, his vehicle, or from paved or flat areas within CSX yards or customer sites. These duties included attending morning and evening conference calls with CSX management, addressing customer issues, visiting satellite yards, completing payroll, and

performing various operational tests (observing employees to ensure that they perform their work properly). Part of Finnegan's duties required him to conduct operational tests, in which he observed and evaluated employees. Finnegan performed the majority of his operational testing by observing employees from a distance-- either from his vehicle or from a paved area. Again, according to Finnegan, doing so was consistent with how he had performed such testing prior to going out on leave. That is, Finnegan represents that before he had gone out on medical leave, he regularly performed this work from his vehicle, from a distance using binoculars, or from an office where he could observe employees on video. He also *believes* it was also consistent with how other managers conducted the majority of their operational testing. For example, at times, Finnegan's colleagues would watch an employee from a distance so that the employee would not know that he or she was being observed.

Finnegan did find that he needed to make some adjustments to how he worked. He ended up working seven days per week, at least ten hours per day, which was more than he typically worked prior to going out on leave. Finnegan did not feel comfortable walking on ballast[2] and rails in high traffic areas, such as on the mainline track where trains operate at higher speeds. The West Springfield yard has live traffic every day and at all hours of the day. Therefore, on occasions when he was required to approach high traffic areas, he did so by driving his vehicles on the roads that provide direct access to the tracks. According to Finnegan, these roads provide access to the overwhelming majority of CSX track. However, paved roads do not provide access to a majority of the tracks in the West Springfield yard. Moreover, investigating derailments and conducting operational tests require the Trainmaster to regularly walk on uneven ballast and

---

[2] "Ballast" is crushed stone, typically two and a half inches in diameter.

unpaved areas, in areas that are sloped and not graded flat, and through snow and ice along the train tracks.

The only operational tests that Finnegan did not feel comfortable performing were the banner tests. Banner tests comprised a small fraction of the operational tests that Finnegan performed each month. Finnegan did not feel comfortable performing those tests on his own because he did not want to go onto live track as a train approached without any safeguards. According to Finnegan, this type of test was ordinarily conducted by more than one Trainmaster. However, since Lutz had resigned, Finnegan did not have another Trainmaster readily available who he could direct to perform the test with him.  He states that he could possibly have performed them with Fitzpatrick.  However, during Finnegan's trial period, Fitzpatrick was performing duties in other areas and only saw Finnegan once. According to Fitzpatrick, he generally performed about 30% of such tests by himself, that is, without the assistance of another Trainmaster.

Finnegan also refrained from climbing and riding on trains.  According to Finnegan, prior to going out on leave, he rarely climbed or rode on trains when investigating derailments. Further, according to Fitzpatrick, he did not believe that Finnegan's predecessor ever climbing or riding on trains, and there were "plenty of managers that never did train rides."

### Finnegan Requests Accommodations

Following his return to work, Finnegan informed Fitzpatrick that he had submitted a request for accommodations to CSX.   Fitzpatrick responded that he did not think that was a good idea because he believed that CSX would refuse to grant him any accommodations and would instead pull him from service.  In a letter dated May 19, 2014, one week after he returned to work, Finnegan,  through his attorney, informed CSX that he felt unsafe "even attempting" to perform certain aspects of his job.  In the letter, Finnegan notified Marshall that he sought certain

workplace accommodations. Marshall received that letter several days later, on or about May 22, 2014. In his letter to Marshall, Finnegan's attorney opined that Finnegan was able to "effectively perform all office functions as well as observe crews from his vehicle or pavement." Finnegan's attorney also informed Marshall that there were certain activities that Finnegan did not feel were safe to perform. Those activities included:

- Walking in or on any areas of ballast or rail

- Riding/climbing on/off trains or locomotives

- Utilizing a brakestick

- Setting up a testing banner

- Approaching any areas of live activity.

- Modification to the hours worked

These issues reflected Finnegan's "initial impression" of the types of work that he was "uncertain" about performing, at least during the trial period. In the letter, Finnegan's attorney stated that his balance was not and was never likely to be 100% and that he requested the accommodations to avoid placing himself or others at risk for injury. Marshall forwarded the letter to Dr. Heligman, who at all relevant times was CSX's Associate CMO (he is currently CSX's CMO.) Dr. Heligman had at least 18 years of extensive experience working with medical issues concerning railway workers,

*Walking in or on any areas of ballast or rail*

Finnegan states that he did not see the requested accommodations as an issue. For example, *according to Finnegan*, not  walking in or on any areas of ballast or rail would not be a problem because prior to going out on medical leave, he was not required to walk on areas of ballast or rail very frequently. Additionally, *according to Finnegan*,  most locations within the West Springfield district were accessible by vehicle, thereby reducing the need to walk on areas of ballast or rail.  Despite this broad request, Finnegan later explained to Marshall that he only sought relief walking on ballast and rail in "unprotected areas."  Following his return to service, Finnegan did walk in areas of ballast or rail when there was no live traffic in the area.  In fact, in the West Springfield yard, the tracks are surrounded by ballast and prior to his surgery, Finnegan regularly conducted signal tests , checked if railcars were secured by handbrakes, examined switches, evaluated how crews used brakesticks, and generally observed yard activities.

According to Finnegan in the case of a situation like a train derailment, because there would be no live traffic on the tracks, he believes he would have felt comfortable going to investigate the derailment, as long as he was able to proceed slowly.[4] Further, where the track is accessible by road, he could drive up to the point of derailment and would limit the amount that he would be required to walk along the rail.[5]  However, Fitzpatrick, who also investigates

---

[3] Finnegan made two separate requests for accommodations and numerous factual findings and whether they are reasonable are relevant to both requests.  In an attempt to reduce the amount of repetition, some facts relating to Finnegan's accommodation requests, as well as facts relating to the Trainmaster's duties, will be stated only in connection with either the first or second request for accommodations. Nonetheless, such factual findings are relevant to both requests.

[4] Finnegan suggests that when there is a derailment, there can be no movement along the rails, that is, traffic is tied up, and therefore, proceeding slowly would not be a problem.  Finnegan does not explain why under such circumstances, where people could be injured, time would not be of the essence in getting to the derailment. Nonetheless, I will accept his asserted fact as true.

[5] According to Finnegan, the "overwhelming majority of track is accessible by road." Not only is this asserted fact disputed, it is not supported by the record evidence.

derailments, states that he "would typically walk to the site of a derailment for as much as "a train length or half a train length," including "at times" walking through "deep snow" to investigate a derailment. Derailments happen at least once a month, at all times of day, and in all types of weather. Thus, Trainmasters are required to regularly walk on uneven ballast and unpaved areas, in areas that sloped and not graded flat, and through snow and ice.

*Riding/climbing on/off trains or locomotives*

Finnegan also requested accommodations regarding riding and climbing on trains. Prior to his medical leave, Finnegan had climbed onto or rode train cars on what he describes as rare occasions. However, he did not understand that doing so was a necessary or regular part of his job as Trainmaster. Unlike the Yardmaster job description, neither the Trainmaster job description nor any other CSX manual requires Terminal Trainmasters to ride or climb on locomotives. The CSX Operational Testing and Data Reporting guidelines manuals do reference that a manager might ride a train for purposes of operational testing related to "Signals," and "Train Handling." For Signals testing, the test can be performed by riding the train, or, alternatively, by observing the train and/or downloading data from an onboard "event recorder," and, for Train Handling, "The testing officer can verify action by a remote download or through applicable technology." For these reasons, Finnegan did not think the requested accommodations would be an issue.

In January 2014, Lewandowski had sent managers, including Finnegan, an email reminding them that the "the 1 train a month train ride still stands. When completed please send the write up … ." One individual was excused from doing a train ride for January 2014—however, this was a *one-time* excuse. According to Fitzpatrick, the requirement to ride trains did not always exist and it "changed year to year," and, under certain circumstances, such rides could be excused, depending on "how hot the subject was at that particular time." However, in

addition to the January reminder, in September 2013, Lewandowski had sent Trainmasters several reminders about the monthly train ride. According to CSX's Director of Operational Rules and Practices, Matthew Meadows ("Meadows"), CSX did not have any policies concerning the accommodation of disabled employees with regard to the performance of operational tests.

*Utilizing a brakestick*

Finnegan was also uncomfortable using a brakestick. However, he does not believe that the Trainmaster position required him to do so.

*Setting up a testing banner*

Finnegan acknowledges that each Trainmaster performs, operational tests, including "banner tests." As explained previously, banner tests require Trainmasters to enter onto live tracks to set up a "banner" in order to test whether the conductor was able to stop the train in time to avert a collision. These tests were at times performed with the assistance of another Trainmaster or manager. Finnegan performed approximately 100 operational tests each month, approximately four of which were banner tests.

Before he went out on medical leave, Finnegan, Fitzpatrick, and Lutz would perform three separate sets of operational tests. After Lutz resigned following Finnegan's return from medical leave, Finnegan did not want to attempt to perform the banner test alone. Specifically, Finnegan did not want to set the banner on the tracks as a train approached. He therefore sought relief from "setting up a testing banner." Finnegan would have been willing to perform the test if a second Trainmaster or supervisor set the banner up and Finnegan observed the test, which  he believed would have been consistent with CSX's rules. Finnegan believed that since it was "customary" for  managers to perform banner tests with other managers, accommodating this request would not have required a significant change in CSX's practices.

*Approaching any areas of live activity*

Finnegan also requested an accommodation from approaching areas of live activity. According to Finnegan, prior to taking medical leave, due to safety concerns, unless he was in his vehicle, it was uncommon for Finnegan to approach areas of live activity, *i.e.,* where moving cars or equipment were in close vicinity. However, by "uncommon" Finnegan does not mean it was not required, rather he did not do it more than once or twice a month. Finnegan would most commonly be in close proximity to areas of live activity as part of his regular job duties was when he would conduct the previously described banner tests, particularly in areas of the mainline track. In addition, speed tests, signal caller tests, observations and review of emergency protocols all require Trainmasters to work along the tracks or in the yard at times when there is live train traffic.

*Modification to the hours worked*

Trainmasters are on call 24 hours per day, 7 days per week. Moreover, the Trainmaster job description provides that "[w]ork hours may vary in length and schedule," "may include a nonstandard workweek and various shift work," and "include on call 7 days a week, 24 hours per day, with extended periods of time away from home." Although Finnegan states that he was uncertain as to whether an accommodation would be necessary regarding hours he could work, he repeatedly told Marshall from February to May 2014, that he had concerns about his ability to work the hours required of a Trainmaster. Prior to taking medical leave, Finnegan shared duties with a second Terminal Trainmaster, Lutz, who reported directly to Finnegan; Finnegan had the right to direct Lutz as he pleased. After Lutz left CSX, Finnegan covered all Terminal Trainmaster duties for the West Springfield terminal. Finnegan worked in excess of 70 hours per week without taking a single day off. He was hoping that after CSX replaced Lutz, the number of hours that he would have to work might be reduced. According to Finnegan, he would not have

sought to be excused from working extended hours in the case of an emergency, such as a derailment. CSX did in fact fill Lutz's position, as well as Finnegan's position, after removing Finnegan from service, that is, after he left, two Trainmasters were available to cover various duties.

<u>*CSX's Response to Finnegan's First Set of Accommodation Requests*</u>

On or about May 22, 2014, after receiving the letter from Finnegan's attorney, Marshall called Finnegan and engaged in a discussion with him regarding the accommodations identified in the letter. Marshall summarized the conversation as follows in his Case Progress Notes:

> Talked with employee, he is continuing to work as a Trainmaster but he does find that he is not comfortable with approaching any areas of live activity, or walking on ballast in unprotected areas or riding climbing on and off trains, setting up banners. He reports that he has been doing his work from the office and car without doing these activities. He is doing payroll, having contact with his employees and customers. But he does not feel that he can do those activities he outlined safely. He plans to continue as Trainmaster as long as he is allowed not to do the above activities. He is also going to continue to apply for other jobs within CSX such as the manager of field investigation position, etc. Told him that I would continue to assist him with that.

Marshall was unaware that, prior to Finnegan going out on leave, a second Terminal Trainmaster (Lutz) had been assigned to the West Springfield terminal, or that, after returning from leave, that person resigned. Marshall felt that given Finnegan had already returned to work and resumed his job responsibilities, he believed dialogue with Finnegan was appropriate, so he planned to speak with Lewandowski regarding Finnegan's accommodation requests. Marshall felt that Lewandowski would know whether an accommodation could be made or not for particular issues raised by Finnegan. Marshall would discuss with a manager, such as Lewandowski, if a requested accommodation was acceptable. If it wasn't acceptable, they would try to explore alternative accommodations and discuss with the employee seeking the

accommodation why the requested accommodation was not acceptable and what alternatives might be considered.

On May 23, 2014, Marshall emailed Lewandowski, "I just talked with Finnegan. He has concerns about doing certain aspects of his job. I need to discuss this with you. Please give me a call when you can.". Marshall's case notes reflect the following conversation with Lewandowski: "Talked with Jerry Lewandowski about the employee's safety concerns and alternative options for employee. He will talk to the employee and we will explore further." Lewandowski never discussed the proposed accommodations with Finnegan.  Neither Marshall, Dr. Heligman, nor anyone else from CSX, contacted Finnegan again to discuss the accommodation requests included in his attorney's letter or to discuss his job performance after he returned from medical leave.  According to Meadows, active working managers are required to perform operational tests without exception, and he is not aware of any policies concerning the accommodation of disabled employees with regard to the performance of operational tests.

On May 28, 2014, Marshall emailed Finnegan and explained that "we need to have medical documentation for the restrictions that you discussed with me concerning your balance and being unable to walk on ballast and be around live track."  Marshall followed up with a call to Finnegan on June 3, 2014, and they further discussed Finnegan's issues concerning walking on ballast.  Also, on May 28, 2014, at 1:28 p.m., Marshall emailed Jenn Fry and, referring to Finnegan, asked, "Would it be possible for him to go back as a Yardmaster?" Jenn Fry ("Fry") responded several days later, "Yes."  After emailing Fry regarding whether Finnegan could return to a Yardmaster position, Marshall emailed Finnegan asking for him to provide an updated medical report: "We need to have medical documentation for the restrictions that you discussed with me concerning your balance and being unable to walk on ballast and be around

live track." Throughout this time, with the exception of operational testing, Finnegan continued to perform his Terminal Trainmaster duties in what appeared to be a satisfactory fashion. In fact, a CSX Customer Service manager, John Orr, wrote to Lewandowski on May 31, 2014: "Joe Finnegan is good!! I really appreciate his focus on the customer. He's been great to work with!! This customer has been extremely difficult to work with and Joe has helped me every step." As far as Fitzpatrick and Lewandowski were aware, Finnegan was performing all of his duties as Trainmaster since his return from medical leave. However, Finnegan admits that he did not perform any of the four required banner tests and did not inform Lewandowski that he was not performing the tests. Additionally, Lewandowski never saw Finnegan and spoke to him only once during his trial return to work.

*Finnegan's Second Request for Accommodations*

On June 4, 2014, Finnegan submitted his second request for accommodation. As part of the submission, Finnegan submitted the accommodation forms that Marshall had forwarded to Dr. Heligman. On the Attending Physician's Return to Work Report, Finnegan's physician, Dr. Walter Goula ("Dr. Goula"), confirmed that Finnegan could return to work, but to accommodate Finnegan's hearing and balance loss, he should do so with the restrictions that Finnegan had requested in the accompanying CSX Employee Accommodation Request Form. The accommodations that Finnegan requested in the CSX Employee Accommodation Request Form included the following requests:

- Excused from Operating Practice Testing System requirements

- Reduction in excessive work hours

- Relief from entering yards, customer facilities, sidings & mainline tracks
  that are not paved or graded flat

- Excused from lifting objects in excess of 10 pounds

- Excused from riding or climbing onto locomotives or rail cars

- Excused from all areas of live traffic.

These accommodations are similar to those identified in his attorney's letter dated May 19, 2014 and outlined above. Finnegan no longer sought relief from using a brakestick, but he did seek the additional accommodation of relief from lifting objects in excess of 10 pounds.

### CSX's Response to Finnegan's Second Accommodation Requests

On June 4, 2014, after reviewing Finnegan's accommodation's request, Dr. Heligman, who supervised Marshall at the time, responded, "Do formal discussion with Mr. Lewandowski and document conclusions in RMS. I don't see how he can accommodate the restrictions/accommodations requested, but we need manager review to determine what, if any, options he can suggest. If unable to accommodate for permanent restrictions, then we will need to revisit his options under Voc Rehab."  After reviewing the accommodation request and determining they could not be made, Dr. Heligman suggested that Marshall speak with Finnegan. Marshall called Finnegan on June 6, 2014 and asked if the accommodation requests were still the same. When Finnegan responded in the affirmative, Marshall explained that he could not return to work with those accommodations.  Dr. Heligman was not particularly familiar with Finnegan's job duties at the West Springfield yard. He was, however, familiar with the duties of a Trainmaster.  Lewandowski did not contact Finnegan to discuss the requested accommodations or to tell him that the accommodations were not acceptable.[6]

Lewandowski and Marshall believed that in his request to be "Excused from Operating Practice Testing System requirements," Finnegan was seeking to be excused from performing

---

[6] Finnegan's contention that *no one* from CSX talked to him about accommodations is not supported by the record evidence. It is not clear whether Finnegan is referring to a lack of communication prior to June 4, 2014, or both before and after that date.  Certainly, there is record evidence to support a finding that CSX personnel communicated with him after that date. While there is evidence to support CSX's position that CSX personnel did speak with Finnegan, I will assume that whether such conversations took place is disputed.

"all" operational tests--- which is literally what his request sought. However, according to Finnegan, he was only seeking to be excused from the "banner test." Finnegan further takes the position that he would have agreed to continue to perform the banner test but would have asked that a different Trainmaster or supervisor set up the test while he observed. Dr. Goula believed that Finnegan was not seeking relief from all operational testing, rather Dr. Goula viewed operational testing as a broad category of work duties and that the remaining accommodation requests were meant to limit how Finnegan performed operational testing.

As to Finnegan's request for "reduction in excessive work hours," as of June 6, 2014, he had not taken a single day off since his return to work on May 12, 2014 and had been working more than ten hours per day. Lewandowski did not know or recollect how many hours Finnegan had been working since he had returned from medical leave but notes that it was not unusual to work seven days a week. Despite the phrasing of the request, Finnegan contends that he was able to work long hours. According to Finnegan, by this request, he was looking for confirmation that CSX would eventually replace Lutz.

With regard to the request that Finnegan be "relie[ved] from entering yards, customer facilities, sidings & mainline tracks that are not paved or graded flat," CSX did not believe this request to be reasonable because ballast is in the gauge of the rail, between almost all of the tracks in the West Springfield yard and some mainline tracks outside the yard. While some areas that were not paved or graded flat were accessible by road, paved roads do not provide access to a majority of the tracks in the West Springfield yard. Lewandowski was not aware that Finnegan had in fact begun to walk on ballast or in areas around the yard. According to Fitzpatrick, the overwhelming majority of track was in fact accessible by road and that most of the areas that were not graded flat only had a slight grade. However, investigation of derailments regularly

requires Trainmasters to walk on uneven ballast and unpaved areas, sometimes in snowy and icy conditions.

Lewandowski did not have an issue with the Finnegan's request that he not be required to lift objects in excess of 10 pounds. As to the fifth request, "excused from riding or climbing onto locomotives or rail cars," Lewandowski did not feel that the request could be accommodated but was unable to point to or recall any specific CSX document that stated doing so was a necessary part of a Trainmaster's job duties. However, while neither the Trainmaster job description, nor CSX's Operational Guidelines require Terminal Trainmasters to climb or ride on trains, the CSX Guidelines for Operational Testing and Data Reporting requires that "Signal" and "Train Handling" testing be performed while riding the train. These tests can be conducted, alternatively, for "Signal" by observing the train and/or downloading data from an onboard "event recorder," and, for Train Handling, by a remote download or through applicable technology." As stated previously, the Trainmaster was required to take monthly train rides with the train and engine crew. Boarding of trains is done for other purposes as well. Trainmasters board trains to speak with the crew or to address safety issues. For example, to confirm that electronic devices are properly stowed. Fitzpatrick did not find boarding trains to test employee's compliance with rules regulating use of electronic devices as necessary or even particularly helpful because it was easy for employees to see the manager coming. However, according to another of Finnegan's colleagues, a Trainmaster ultimately had to go on the train to explain to the employee what he did right or wrong, and certain observations had to be conducted *on the train*, such as ensuring whether the employee's cell phone was properly stowed, what belongings the employee had brought with him onto the train, and whether the employee had proper documentation and bulletins in working order and the trip log in its proper place.

With regard to the request to be "excused from areas of live traffic," according to Finnegan, he was primarily concerned with being around live traffic in "unprotected areas" that were close to moving equipment, which, as acknowledged Lewandowski, was generally the rule for all employees due to safety concerns. Finnegan acknowledges that before his surgery he did certain tests within five feet of the rail tracks. Finnegan also acknowledges that to investigate derailments, the Trainmaster walks the track to examine the train and the track, occasionally getting down on his knees to examine the track and bending and stooping. He also acknowledges that conducting banner tests, speed test, signal calling tests, observations, and reviewing emergency protocols all require the Trainmaster to work along mainline tracks or in the yard in areas that are unpaved and not graded flat. Finnegan told his surgeon that he walks the rails a lot and told Dr. Goula that his job required him to walk on the rails at the rail yard.

Finnegan had doubt about his abilities to safely perform his duties as Trainmaster. On June 4, 2014, Finnegan emailed a CSX co-worker and stated that he was "[n]ot 100% but other than being deaf on one side and walking like a drunk it could be worse." On June 5, 2014, Finnegan emailed another CSX Trainmaster and stated, in relevant part, "I am deaf on left side and have balance issues. Time to get out of Trans[portation]." On June 6, 2014, Finnegan acknowledged to a CSX Vice President, "I am healed just deaf in one ear and balance nerve on left side gone resulting in inconsistent balance. Not a good mix in a rail yard or mainline with live activity."

### Finnegan's Removal from Service

On Friday, June 6, 2014, Marshall called Finnegan and informed him that he could no longer work as a Trainmaster and that he could either return to his Yardmaster position or go on long term disability while looking for a new position within CSX. According to Marshall's notes:

Talked with employee today after thoroughly exploring with all parties whether an accommodation could be made for Finnegan to continue as Trainmaster with the restrictions that he has outlined for us. They cannot be accommodated He understands. It was discussed with the employee that one option for him would be to return to a Yardmaster position as he holds seniority to do so. The other is to go on LTD and continue to look at alternate positions to apply for. He said that he plans to do that. He has had a telephone interview for the Brentwood Field Manager position and he is waiting to hear whether he will be called for the in-person interview.

According to Finnegan, Marshall did not discuss the accommodation requests with him, but instead simply told him that he would no longer be allowed to work as a Trainmaster.

Lewandowski was the person who ultimately decided that Finnegan could not be reasonably accommodated in his position as Trainmaster. According to Lewandowski, he made that decision following his review of Finnegan's accommodation requests, which Marshall had emailed to him on June 6, 2014. Moreover, Lewandowski made the decision after consultation with Marshall and Dr. Heligman. According to Finnegan, he received a call from Marshall removing him from service before Lewandowski would have received Marshall's email outlining Finnegan's accommodation requests. However, according to record evidence provided by CSX, Lewandowski received Marshall's email and made the decision to remove Finnegan before Marshall called Finnegan. Also on June 6, 2014, Marshall informed Katriana Feliciano, the CSX employee who communicated with CSX's long term disability carrier, that Finnegan was "unable to perform the essential functions of his position as trainmaster, because of his medical problems."

After receiving requests for accommodation of a disability from an employee, Marshall would typically engage the employee in a discussion about alternative options. According to Marshall, no one told Finnegan that his proposed restrictions weren't acceptable because CSX was still evaluating the requests. Marshall generally talked to the employee about whether s/he had any specific ideas about possible work restrictions, that is, that the employee could proposed

alternative accommodations. However, Marshall's case notes do not reflect that he had such a conversation with Finnegan. Marshall did offer Finnegan one accommodation—he could return to work as a Yardmaster. Finnegan declined.

In a letter to Finnegan dated June 9, 2014, Marshall confirmed that CSX was removing Finnegan from his Trainmaster position. In that letter, Marshall reiterated that Finnegan could still return to work as a Yardmaster. Finnegan declined to accept the Yardmaster position, in part because it would have been a demotion to a non-management position, which paid significantly less than the Trainmaster and in part, because of *his belief* that the Yardmaster position was also a physically demanding job that would have been at least as difficult to accommodate as the Terminal Trainmaster position-- unlike the Trainmaster position, the Yardmaster job description classified the Yardmaster position as "Safety Sensitive."[7] Yardmasters, like Trainmasters, were required to be out in the yard at times. Blake confirmed that Yardmasters engage in a number of activities that require that they walk around the yard in a manner similar to that of a Trainmaster (such as checking for train discrepancies or assisting at the site of a derailment).  Moreover, according to Fitzpatrick, at times, the Yardmaster position would be more demanding the Trainmaster position. According to  Lewandowski, however, Yardmasters do not perform significant amounts of work outside of their office.

<u>Finnegan Applies for other CSX Positions</u>

While Finnegan remained out on medical leave, he anticipated that he would to return to his Trainmaster position, but he also began applying for other positions within CSX

---

[7] CSX has cited to record evidence which would support a finding that the Yardmaster position is not as physically taxing as the Trainmaster position, and therefore, easier to make accommodations for.  Therefore, while I will accept as a fact that Finnegan may have *believed*, it was, Finnegan's asserted fact that it was as physically taxing is simply not supported. Moreover, while Finnegan attempts to infer that "Safety Sensitive" means that an individual could be hurt while performing the job, it actually refers to the fact that the individual is privy to confidential information.

that he believed he was qualified for that would be more compatible with his disability. For example, on February 25, 2014, Finnegan emailed Marshall inquiring as to if there are any other management positions in other fields available in the Albany area. Mr. Gaylord, the District Manager, responded and left a message that he believed a Manager of Field Investigation position might be opening. Finnegan messaged him back that given his background in investigations and a degree in Criminal Justice, that would be a position that he would be interested in. Finnegan emailed Marshall stating:

> I would like to use the Vocational Rehabilitation Program to obtain this job. I am qualified with my BS in Criminal Justice, my 13 years as a Massachusetts State Trooper, my years of service with CSX as well as my Supervisory experience here at the Railroad as well as in the private sector as a small business owner. My personal safety record and performance evaluations are excellent. I look forward to hearing back from you.

Marshall forwarded Finnegan's email to CSX's Tennessee Division Manager, Lee Miller, and CSX's Talent Advisor, Amber Robinson ("Robinson"), stating, "I would appreciate it if you could see that Finnegan gets an opportunity to interview for the position. I think he could be a good fit. He is working with me through Voc Rehab." Robinson responded, "Thank you for the heads-up."

A few days later, on February 27, 2014, Marshall entered into the Case Progress Notes that "balance issues would be the same" with the Manager of Field Investigations position, "however, they work more of a regular schedule whereas trainmaster is on call 24 hours and you often work overtime, which can cause some of the problems he is experiencing." Marshall was aware that Finnegan believed that he would be able to perform the field investigation job despite his disability. According to Marshall, Finnegan's disability would not have been considered during the selection of the most qualified candidate for the filed investigation position-- the issue of whether Finnegan's disability could have been accommodated in that position would only

have been considered after the selection of that candidate. In Fitzpatrick's experience, Managers of Field Investigations did not spend a lot of time near the rail and he had never observed a Manager of Field Investigations climb onto a train. Finnegan was familiar with the position Manager of Field Investigations as he had observed individuals in that position on many occasions. He was aware that they never operate in areas of live activity and always operate with a Trainmaster present, and he believed he could perform the job with minimal accommodation.

There were two Manager Field Investigation positions open during the relevant period. Robinson, who Marshall had contacted in support of Finnegan's candidacy, called Finnegan on June 5, 2014 to conduct a "phone screen" with him in advance of more formal interviews that were going to be scheduled for the following week. Following his telephone conversation with Robinson, his understanding was that he would be contacted early the following week to schedule a formal interview. However, Finnegan was removed from his Trainmaster position the following day, and he did not hear back from Robinson about a formal interview.

On June 11, 2014, Finnegan emailed Robinson to follow up on his application for the Manager of Field Investigations position. Robinson responded two days later, stating, "[a]t this time, we are pursuing other individuals who have a stronger skill set." Finnegan does not believe that the other individuals were more qualified. Finnegan had a degree in Criminal Justice, six years of experience at CSX as a Freight Conductor, Yardmaster and Trainmaster, plus 13 years of law enforcement experience and experience as a small business owner. For one of the available positions, CSX hired Jeremy Kunzman, who had worked for the CSX Railroad Police Department for just over one year, and he only had four years of prior experience outside of CSX in law enforcement. However, as pointed out by CSX, Kunzman had a degree in business administration, had railroad and police experience, ranked second in academic standing at his law enforcement academy, had a very strong recommendation from his CSX manager, and

interviewed very well. For the other position, which Finnegan apparently did not apply for[8], CSX hired Blake Scearce, who had  degree in physical education and had not previously worked for CSX—he had four years of experience at a different railroad and no other particularly relevant experience.

According to Robinson, she did not afford Finnegan a formal interview after the thirty minute "phone screen" conversation she had with him because his communication and enthusiasm were lacking. More specifically, Robinson felt that Finnegan did not demonstrate strong communication during they phone conversation— Finnegan had no questions for Robinson regarding the position and did not articulate what interested him about the position or why he would be a good fit. As to enthusiasm, Finnegan was not proactive during their conversation, for example, he did not ask anything about the position. Moreover, he did not reach out to the hiring manager or anyone currently in the position to gain insight into the position: "[e]ssentially, he did not sell himself." Also, his response when asked about his strengths and areas he could improve on was "very canned and very generic." Finnegan believes the phone call lasted only about eight minutes and that he expressed that he was enthusiastic for the job, even indicating he was willing to move.

Robinson denies that Finnegan's disability influenced her decision. She was aware of the fact that Finnegan was receiving assistance from the Vocational Rehabilitation Program, however, she did not know why or have any information about his medical history, impairment, or condition. She did not know that Finnegan had requested accommodations or that he had a disability. Additionally, according to Robinson, she did not decide whether Finnegan should proceed to the interview stage and did not participate in the hiring decision for the position.

---

[8] CSX disputes that Finnegan applied for both of the open Field Manager Positions. More specifically, CSX states that Finnegan did not apply for the opening in Newport News, Virginia.

Finnegan applied for other management positions within CSX, but has not been hired.

These positions include the following:

a. Manager Employee Relations (June 19, 2014, and November 15, 2016)

b. Manager Short Line Development (July 1, 2014)

c. Manager Equal Employment Opportunity (September 2, 2014)

d. Manager Safety - Drug and Alcohol (September 11, 2014)

e. Manager Startup and Integration (October 1, 2014)

f. District Manager Risk Management (March 9, 2015, and March 4, 2016)

g. Manager Field Administration (May 14, 2015)

h. Senior Account Manager (July 2015)

i. Sales & Marketing Leadership Development Program (December 2, 2015, and October 19, 2016)

j. Regional Manager Community Affairs (October 20, 2016)

k. Emergency Communications Specialist (January 29, 2018).

CSX has not interviewed Finnegan for any of the positions for which he has applied.

Finnegan believes that he was well-qualified for these positions based on the minimum qualifications posted for those jobs, as well given his educational and work background.

*Finnegan applied for a Manager Safety – Drug and Alcohol position.*

The minimum qualifications for the Manager Safety – Drug and Alcohol position included an Associate degree and supervisory experience with FRA drug and alcohol regulatory testing. Finnegan has a Bachelors of Science in criminal justice and thirteen years of law enforcement experience, which included four years on the Western Massachusetts Narcotics Task Force, including work with local, state and federal agencies to combat narcotics crimes and abuse. Furthermore, as a Trainmaster, Finnegan

had knowledge of CSX's safety and operating rules and FRA regulatory standards, and Trainmasters were "involved in random employee drug testing" and at times required to perform "mandatory testing."

Finnegan did not have the "Face to Face" training and "Reasonable Suspicion" training required for the position. The candidate who CSX hired for this position, Ben Darrell Padgett, had regulatory training. He also had over 13 years of drug and alcohol testing supervisory experience and had completed 219 training courses that Finnegan had not taken, and over 20 years of field experience compared to Finnegan's 6 years. However, he did not have an Associate degree, which was one of the requirements listed in the job description.

### *Finnegan twice applied for a District Manager Risk Management position.*

The qualifications for this position included a Bachelor's degree, three years of experience in a related field, and Advanced Association of American Railroads Clams School certification. Finnegan had a Bachelor's degree and well over three years of experience in a related field, but he did not have the required certification. Finnegan wrote Marshall on March 3, 2016 about attending a four day conference in May 2016 to obtain the necessary certification. He felt he could be provisionally hired pending obtaining the necessary certification. Finnegan was not granted his request for training.

One of the postings was cancelled and as to the one for which Finnegan applied, CSX hired Caroline Apple ("Apple") in 2016. Finnegan and Apple had similar amounts of experience in the railroad industry. While Apple had less overall professional experience than Finnegan, she had the appropriate certification and had worked as a Manager Field Investigations the Risk Management department since 2008

.

### *Finnegan applied for a Manager Startup and Integration position.*

The minimum qualifications for that position were a Bachelor's degree and five or more years of experience in business management. Finnegan satisfied each of those criteria as he had a Bachelor's degree and more than 14 years of experience managing his own business. CSX hired Heath Mondragon, who had a Bachelor's and Master's degree in Business Administration and 17 years operational experience with CSX. Finnegan feels that the candidate hired had more experience working for CSX but had less experience in business management.

### *Finnegan applied for a Manager Field Administration position.*

The Manager Field Administration position required candidates to have a Bachelor's degree and five or more years of experience as a transportation manager, or, if a candidate did not have a Bachelor's degree, then seven years of experience as a transportation manager. Finnegan had a Bachelor's degree and more than five years of experience as a transportation manager, but only if either his experience as a Yardmaster or the time since he had been out on medical leave was credited. CSX hired Joseph Tucker, had worked for CSX for 14 years and who had seven years of required experience, but no Bachelor's degree. He had been working as the Manager of Operations Rules in the same department at the Manager Filed Administration to be filled—he had assisted in writing CSX's Operation Rules.

### *Finnegan applied for an Emergency Communications Specialist position.*

The Emergency Communications specialist position, which Finnegan applied for in December 2017, required candidates to have an Associate degree and three or more years of experience in railroad operations, law enforcement, or a number of other

professional fields. Finnegan had a Bachelor's degree, more than three years of experience with the railroad, and 13 years of experience in law enforcement. CSX hired Michelle Fincannon ("Fincannon"), who had a Bachelor's degree, more than three years of experience with the railroad, but no experience in law enforcement. However, Fincannon had 13 years' experience in customer service positions at CSX, including crew dispatching, shipping and hazmat way-billing. She also had recently worked as a Public Safety Communications Specialist.

The hiring managers for these internal positions were not involved in the decision to remove Finnegan from the Trainmaster position. Likewise, the individuals involved in the decision to remove Finnegan from the Trainmaster position (Lewandowski, Marshall, and Heligman) were not involved in the hiring decisions concerning the other internal jobs to which Finnegan applied.

## Discussion

### CSX's Motion for Summary Judgement on Finnegan's Discrimination Claims

#### *Discrimination Based on Disability*

Finnegan's discrimination claims are governed by the burden-shifting framework of *McDonnell Douglas Corp. v. Green*. 411 U.S. 792, 802, 93 S.Ct. 1817 (1973). Although originally created for use in Title VII cases, the *McDonnell Douglas* analysis is also applied when evaluating discrimination claims under Chapter 151B.[9] *Benoit v. Technical Mfg. Corp.*,

---

[9] There are some nuanced differences between the Massachusetts and federal anti-discrimination laws. For example, "Massachusetts state law refers to an individual's 'handicap' rather than [his] 'disability' —the term favored by the [ADA]. [However,] there is no substantive difference between the two terms" and, therefore, the two terms may be used "interchangeably." *Miceli v. JetBlue Airways Corp.*, 914 F.3d 73, 80 (1st Cir. 2019). Moreover, any differences in the application of the two statutes are irrelevant to the outcome of this case. Therefore, for both Finnegan's discrimination and retaliation claims, I use the same analysis for both the federal and state statutes. This approach is often utilized by courts in this district. *See, e.g.*, *Ruffino v. State Street Bank and Trust Co.*, 908 F. Supp. 1019, 1047 n.50 (D. Mass. 1995) (finding that the same result in Plaintiff's discrimination claim was compelled under state and federal law).

331 F.3d 166, 173 (1st Cir. 2003). The first step of *McDonnell Douglas* requires the plaintiff to establish a prima facie case of discrimination. *Benoit*, 331 F.3d at 173. The task of establishing a prima facie claim of discrimination is "not onerous." *Santiago-Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 54 (1st Cir. 2000). If a plaintiff is successful, the burden of production shifts to the defendant to articulate "a legitimate, non-discriminatory reason for its adverse employment action." *Id*. at 174 (quoting *Straughn v. Delta Air Lines, Inc.*, 250 F. 3d 23, 33 (1st Cir. 2001)). The proffered reason must be one "which, on its face, would justify a conclusion that the plaintiff was let go for a nondiscriminatory motive." *Miceli,* 914 F.3d at 81. "At the third stage of the *McDonnell Douglas* framework, the burden reverts to the employee to show that the adverse employment action was taken 'because of' [his] handicap and 'not for the reason proffered by the employer.' Pretext may be demonstrated in a variety of ways, such as by exposing 'weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions' in the employer's proffered reason. " *Id.* at 82 (citation to quoted cases and internal citations omitted).[10]

Finnegan alleges that CSX discriminated against him based on his disability by refusing to accommodate him, terminating his employment as a Trainmaster, and refusing to hire him in another position. Although the elements of a prima facie case will vary slightly depending on the type of discrimination alleged and the nature of the claim, *see Lockridge v. Univ. of Maine System*, 597 F.3d 464, 470 (1st Cir. 2010), generally, the plaintiff must show:

> "(1) [he] was "disabled" within the meaning of the ADA; (2) that [he] was able to perform the essential functions of [his] job with or without accommodation; and (3) [he] was discharged or adversely affected, in whole or in part, because of [his] disability."

---

[10] "In a Chapter 151B case, an employee can survive summary judgment on this issue by showing pretext, that is, 'that there are disputed issues of fact as to whether the employer's proffered reason was not the true reason' for her termination." *Miceli*, 914 F3d at 82.

*Jones v. Walgreen Co.*, 679 F.3d 9, 14 (1ˢᵗ Cir. 2012) (citation to quoted case omitted).

There is no dispute that Finnegan suffers from a disability within the meaning of the ADA(he is deaf in his left ear and has balance issues). There is also no dispute that he suffered an adverse employment action when CSX removed him from the Trainmaster position. The Court will, therefore, focus on the whether Finnegan has established that he was a qualified individual who was able to do the essential functions of his job, with or without reasonable accommodation.

*Whether Finnegan could perform the essential functions of a Trainmaster.*

A qualified individual is one "who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8).11 Essential functions are the "fundamental job duties of the employment position." 29 C.F.R. § 1630.2(n)(1). "The term does not include 'marginal' tasks but may encompass 'individual or idiosyncratic characteristics' of the job." *Sepulveda-Vargas v. Caribbean Restaurants, LLC,* 888 F.3d 549, 553 (1ˢᵗ Cir. 2018)(citation to quoted case and internal quotation marks omitted).

> '[T]he complex question of what constitutes an essential job function involves fact-sensitive considerations and must be determined on a case-by-case basis.' In making this case-by-case determination, the ADA instructs us to give consideration 'to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job.' And the Equal Employment Opportunity Commission's ("EEOC") implementing regulations of the Act further tell us that beyond the employer's judgment, things to be considered include (but are not limited to) factors like '[t]he consequences of not requiring the incumbent to perform the function[,]' '[t]he work experience of past incumbents in the job[,]' and '[t]he current work experience of incumbents in similar jobs.' Such considerations are not meant 'to enable courts to second-guess legitimate business judgments, but, rather, to ensure that an employer's asserted requirements are solidly anchored in the realities of the workplace, not constructed out of whole cloth.'

*Id.* (citation to quoted authorities and internal citations omitted).

Finnegan has the burden of establishing that he was qualified to perform the essential elements of his job as Trainmaster, with or without reasonable accommodation. Finnegan concedes that he cannot perform essential elements of the Trainmaster position without reasonable accommodations. The accommodations he suggests are: (1) that he be excused from certain aspects of operational testing; (2) he not be required to work excessive work hours; (3) that he not have to enter yards, customer facilities, sidings and mainline tracks that are not paved or graded flat; (4) that he be excused from riding or climbing onto locomotives or rail cars; and (5) that he be excused from all areas of live traffic.[11] However, *all* of these requested accommodations seek to excuse Finnegan from having to perform essential elements of his job. Consequently, either those functions would not be performed (some of which are mandated by regulations governing the railroad industry), or CSX would have to hire additional Trainmasters to perform those functions. As will be discussed in more detail below, Finnegan's contentions to the contrary are simply not supported by the record evidence.

In his statement of material facts, Finnegan attempts to redefine the requirements for the Trainmaster position and to downplay the physical requirements required by cherry-picking portions of CSX policies, citing to incomplete references in the record and citing deposition testimony and other evidence out of context. However, what the record establishes is that the Trainmaster position is physically demanding and, in connection with conducting operational tests and investigating derailments, *requires* a significant amount of walking on ballast (uneven ground), walking near live tracks, climbing onto and riding on trains. Moreover, Trainmasters

---

[11] Finnegan also requested that he be excused from lifting objects in excess of 10 pounds. CSX did not have a problem with this requested accommodation as lifting heavy objects was not an essential function of the Trainmaster position.

have regularly scheduled on-call hours which makes for long work days during which they are required to work in all types of weather, including when there is a significant amount of snow and ice. This is particularly true when derailments occur--- derailments occur regularly and it is part of the Trainmaster's responsibility to coordinate activities related to derailments and to investigate them *by going to the scene of the derailment.*

Plaintiff's suggested accommodations, such as sitting in his car and observing CSX employees with binoculars, making other observations by riding along the tracks, walking very slowly under circumstances in which time may be of the essence, and being excused from climbing onto an/or riding on trains are not accommodations which permit him to perform the essential functions of his job. On the contrary, Plaintiff is, in effect, seeking to excuse himself from having to perform essential job functions.  In doing so, he fails to appreciate that the essential functions of the Trainmaster position include responsibilities for ensuring the safety of other CSX employees and the public at large. Plaintiff's inability to perform the essential functions of the Trainmaster position, with his suggested accommodations, puts the safety of others at risk. Accordingly, I find that CSX is entitled to summary judgment on Finnegan's claim for discrimination under the ADA and Chapter 151B for terminating him as a Trainmaster.

*Whether CSX Failed to Accommodate Finnegan by offering him Alternative Employment*

Finnegan also asserts that CSX failed to accommodate him by failing to hire him for numerous positions for which he was qualified.  In such a case, the burden for the employee at the second step of the prima facie inquiry is to demonstrate that he can perform the essential functions of the position(s) which are available and for which he applies. *Audette v. Town of Plymouth*, 858 F.3d 13, 20–21 (1st Cir. 2017)(employee must demonstrate that there is actual vacant position to which she can transfer; employer is not required by ADA to create a new job for an employee, nor to re-establish a position that no longer exists). CSX asserts that this claim

fails because first, because it offered Finnegan the Yardmaster position, which was an equivalent job for which Finnegan could perform the essential functions, with accommodations. Finnegan refused the position. Additionally, CSX argues this claim fails because as to one potential job, Finnegan didn't even apply and as to the rest, Finnegan either wasn't qualified for the positions, or more qualified individuals were hired.

Finnegan has identified numerous positions for which he had applied and been turned down by CSX including: Manager Field Investigation, Manager Employee Relations, Manager Short Line Development, Manager Equal Opportunity, Manager Safety- Drug and Alcohol, Manager Startup Investigation, District Manager Risk Management, Manager Field Administration, Senior Account Manager, Sales & Marketing Leadership Development Program, Regional Manager Community Affairs, and Emergency Communications Specialist. Finnegan has proffered evidence that he could perform the essential functions of most of these positions, with or without reasonable accommodations.[12] Accordingly, I find that the has made out his prima facie case.

CSX argues that it offered a Yardmaster position to Finnegan as an accommodation, but he turned the position down. CSX has presented evidence that, with his requested accommodations, Finnegan could have performed the Yardmaster position, which per CSX policy, is substantially a sedentary position. However, there is a genuine issue of material fact as to whether Finnegan could, with accommodations, perform the Yardmaster position. Moreover, it paid less than the Trainmaster position and was not a managerial position and, therefore, there

---

[12] CSX withdrew one position that Finnegan applied for, that is, CSX did not hire anyone. Additionally, one position as to which Finnegan claims he was the most qualified candidate, a Manager Field Investigations position, he never applied for. Finnegan cannot pursue his failure to hire claim with respect to these positions.

is also a genuine issue of material fact as to whether offering Finnegan that position was a reasonable accommodation.

Finnegan asserts that CSX did not hire him for the following positions for which he applied, was qualified and could perform the essential functions of the jobs, with or without reasonable accommodation: Manager Filed Investigations, Manager Startup and Integration Position, Managed Field Administration[13], District Manager Risk Management, and Emergency Communications Specialist. The burden now shifts to CSX to establish that it had legitimate, non-discriminatory reasons for not hiring Finnegan for any of these positions. CSX has presented evidence that Finnegan was not qualified for two of the jobs for which he applied: the Manage Safety—Drug and Alcohol position (he lacked the requisite training for the position), and District Manager Risk Management (he lacked the requisite certification). As to the remaining jobs, CSX asserts that it hired individuals who were more qualified than Finnegan. Moreover, CSX asserts that the record evidence is that the persons who made the hiring decisions, were not aware that Finnegan was disabled and/or seeking workplace accommodations.

CSX has presented compelling evidence that Finnegan was not selected for the jobs for which he applied either because he was not qualified, or because other candidates were better qualified. At the same time, while the evidence is scant, I cannot at this stage of the preceding, find, as a matter of law, that CSX's stated reasons for not hiring Finnegan are legitimate, that is, CSX's refusal to hire Finnegan was not, at least in part, based on his disability. In making this determination, I have considered the following: (1) he timing of the hiring decisions; (2) the fact that Finnegan was never interviewed even though he appears to have been a strong candidate at

---

[13] There is some question as to whether Finnegan met the qualifications for this position which required a Bachelor's degree *and* five or more years' experience as a transportation manager. However, for purposes of this Memorandum of Decision and Order, I will assume he had the requisite qualifications.

least for some of the positions; and (3) the fact that Marshall, who was aware of Finnegan's disability and accommodation requests, communicated with Robinson who at least participated in the hiring process in some capacity. Therefore, I find that summary judgment is not warranted on Finnegan's failure to hire claim.

### *Finnegan's Retaliation Claims*

Finnegan's retaliation claims are also governed by the *McDonnell Douglas* analysis. *See Jones*, 679 F.3d at 20-21. To establish a prima facie case of retaliation under both the ADA and Chapter 151B, a plaintiff must show: (1) he engaged in a protected activity; (2) he suffered a materially adverse action; and (3) there was a causal connection between the protected activity and the adverse action. *See Dixon v. Int'l Bhd. Of Police Officers*, 504 F.3d 73, 81 (1st Cir. 2007); *Psy-Ed Corp. v. Klein*, 459 Mass. 697, 707, 947 N.E.2d 520, 530 (2011). The term "protected activity" refers to action taken by the plaintiff "to protest or oppose statutorily prohibited discrimination." *Fantini v. Salem State Coll.*, 557 F.3d 22, 32, (1st Cir. 2009). *See also Mole v. Univ. of Mass.*, 442 Mass. 582, 591 n.13, 814 N.E.2d 329 (2004). Under the ADA, such activity includes "oppos[ing] any practice made an unlawful employment practice by [the ADA]**,**" or "ma[king] a charge, testif[ying], assist[ing], or participat[ing] in any manner in an investigation, proceeding, or hearing under [the statute]". 42 U.S.C. § 2000e-3." Adverse action" in the retaliation context is an act "that could well dissuade a reasonable worker from making or supporting a charge of discrimination." [14] *Dixon*, 504 F.3d at 81. The temporal proximity of an adverse employment action to the protected activity can give rise to an inference of causation.

---

[14] Adverse action under the Massachusetts statute is defined as: "any action 'to coerce, intimidate, threaten, or interfere with' the plaintiff." *Dixon*, 504 F.3d at 81 (citing *Mole*, 442 Mass. 582, 591-92 n.14, 814 N.E.2d 329). The definition of protected activity under Massachusetts law is substantially similar. A plaintiff has engaged in protected activity if "he has opposed any practices forbidden under this chapter or because he has filed a complaint, testified or assisted in any proceeding under [the statute]." Mass.Gen.L. c. 151B § 4(4).

*See Calero-Cerezeo v. U.S. Dep't of Justice*, 355 F.3d 6, 25 (1st Cir. 2004). If a plaintiff makes out a prima facie claim, the reviewing court proceeds to the remaining steps of the *McDonnell Douglas* burden-shifting framework. *See Jones*, 679 F.3d at 20-21 (1st Cir. 2012).

Finnegan alleges that after he sought reasonable accommodations from CSX to permit him to continue working as a Trainmaster, CSX retaliated against him by refusing to hire him for open positions at the company for which he was qualified. Based on this allegation, I find that Finnegan has alleged that he engaged in a protected activity (he was a person with a disability who sought accommodations from his employer relating to the essential functions of his job) and he suffered an adverse action (he was not hired for positions for which he applied and was qualified). Therefore, Finnegan has established a prima facie case of retaliation under the ADA and Chapter 151B. CSX alleges that it has met its burden under *McDonnell Douglas* by providing nonretaliatory reasons for not hiring him for the open positions: Finnegan either was not qualified and/or a more qualified candidate was hired. CSX also argues that Finnegan cannot establish retaliation because he cannot show that those who made the decision not to hire Finnegan were aware of his disability and/or request for accommodations. As with Finnegan's principal claim, I agree with CSX that the evidence is scant that it failed to hire Finnegan for any of the open positions for which he applied in retaliation for him having sought accommodations for his disability. Additionally, there is little evidence to support a finding that the persons who made the hiring decisions were aware of Finnegan's protected activity. However, at this stage of the proceedings, I cannot find that there is *no* evidence to support Finnegan's claim on these issues. Because there are disputed issues of material fact, I cannot find that CSX has met its burden to establish that it had a legitimate reason not to hire Finnegan which was unrelated to his protected activity. Therefore, CSX's motion for summary judgment is denied.

<u>Finnegan's Motion for Partial Summary Judgment: Whether CSX Failed to Engage In the
Interactive Process</u>

Finnegan claims that CSX failed to engage in an "interactive process" with him to identify other appropriate accommodations. The ADA's regulations provide that "it may be necessary for [the employer] to initiate an informal, interactive process with the qualified individual [the employee] with a disability in need of the accommodation." 29 C.F.R. § 1630.2(o)(3) (2005). Accordingly, where an employer becomes aware of an employee's disability, it is expected to engage in a meaningful dialogue with the employee to find the best means of accommodating that disability.

A protracted discussion of this issue is not warranted. There is more than ample evidence that CSX employees not only knew of their obligation to work with Finnegan to determine whether he could perform the essential functions of his job as Trainmaster, and if necessary, any accommodations which would permit him to perform those job functions, they actively engaged with Finnegan and his counsel regarding his disability and proposed accommodations. As aptly put by CSX, "[n]either the facts nor the law support Finnegan's argument that CSX failed to engage in the interactive process." Accordingly, Finnegan's motion for partial summary judgment is denied.

## <u>Conclusion</u>

For the reasons set forth above:

1.    Plaintiff Joseph Finnegan's Motion for Partial Summary Judgment (Docket No. 46), is ***<u>denied</u>***; and

2. Defendant CSX Transportation, Inc.'s Motion For Summary Judgment (48) is **_granted_**, **_in part_** and **_denied,_** **_in part._**

SO ORDERED.

_/s/ Timothy S. Hillman_
TIMOTHY S. HILLMAN
UNITED STATES DISTRICT JUDGE